917 F.2d 557
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Ronald E. GRAY, Plaintiff-Appellant,
v.
Ronald S. NEWLAN, President, Resource Consultants, Inc.;
Benjamin S. Skinner, Defendants-Appellees,
and
A.F. Smith, President, Gilbert and Associates, Inc. Defendant.
 No. 89-2830.
 United States Court of Appeals, Fourth Circuit.
 Argued May 8, 1990.
Decided Nov. 6, 1990.
As Amended Nov. 13, 1990.
Rehearing and Rehearing In Banc Denied Dec. 11, 1990.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Albert V. Bryan, Jr., Chief District Judge. (CA-89-735-A)
 Robert Edward Howard, Sr., argued Washington, D.C., for appellant.
 Christine Hope Perdue, Hunton & Williams, argued Fairfax, Va., for Appellees; Charles F. Martel, Hunton & Williams, Fairfax, Virginia, on brief.
 E.D.Va.
 AFFIRMED.
 Before WIDENER and MURNAGHAN, Circuit Judges, and McMILLAN, Senior United States District Judge for the Western District of North Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 Ronald E. Gray, who is black, sued his former employer, Resource Consultants Inc. ("RCI"), and several of its employees, alleging, among other things, discrimination in compensation, discriminatory discharge and retaliatory discharge. Gray has appealed the district court's grant of summary judgment to the defendants.
 
 
 2
 * RCI is a private contractor providing products and services in support of United States Department of Defense projects. The company is organized into a series of "Operations Centers" which are in turn subdivided into areas of specialization called "Directorates." Employees responsible for the supervision of particular projects within each directorate are given the designation "Project Manager."
 
 
 3
 Gray commenced employment by RCI as a Consultant Analyst on July 22, 1985, beginning work at RCI's Patuxent River office. On August 1, 1986, Gray was promoted to Principal Technical Analyst. On November 1, 1987, he was promoted to Senior Principal Analyst and was designated Project Manager of a defense subcontract with ARINC Research Corporation ("ARINC"). Gray served as Project Manager for the ARINC subcontract because he was largely responsible for bringing the subcontract to RCI.
 
 
 4
 Gray served in the Aviation Directorate within Operations Center 7000. Benjamin Skinner was the head of Operations Center 7000 and Grant Mitchell ran the Aviation Directorate within Operations Center 7000.
 
 
 5
 In February 1988, RCI received a complaint from a Naval Air Systems Command ("NAVAIR") official concerning Gray's work on the ARINC subcontract. (RCI's subcontract with ARINC was for a contract ARINC had with NAVAIR.) The official complained that Gray was late for meetings and did not provide requested cost data. Skinner and Mitchell responded to the complaint by removing Gray from contact with NAVAIR, though retaining him as the Project Manager, and transferring Gray to RCI's corporate headquarters in Vienna, Virginia.
 
 
 6
 Work on the ARINC project ended in August 1988. RCI claims that there was a general decline in the aviation business which led to a general shortage of RCI work. Gray's efforts to bring in business were largely unsuccessful, with the exception of a "bar-coding" project on a pre-existing account. From August 18, 1988, until September 26, 1988, Gray performed no work directly chargeable to an RCI client and over half of his time was charged to a category of overhead costs absorbed entirely by RCI.
 
 
 7
 On July 21, 1988, Gray filed an RCI internal grievance in which he charged RCI with discrimination in reassigning his client contact duties on the ARINC project to his subordinates. On August 16, 1988, Gray filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), in which he repeated the allegations in the internal RCI grievance and also charged that he was being denied equal compensation.
 
 
 8
 On September 26, 1988, RCI fired Gray. The firing prompted Gray to bring suit against RCI, Skinner, Ronald Newlan (RCI's president), and A.F. Smith (president of Gilbert Associates, Inc., RCI's parent corporation). Gray alleged violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Secs. 2000e, et seq. The Title VII claim alleged discrimination in "recruitment, retention, hiring, job placement, demotion/promotion, compensation, employee benefits and termination policies, practices and systems." Gray also alleged that his firing was in retaliation for his protected activity of filing discrimination complaints. He also raised three state-law based claims.
 
 
 9
 After discovery, the defendants moved for summary judgment on Gray's Title VII claims. After hearing oral argument, the district court granted the motion. Gray has appealed only three aspects of his Title VII claim: discrimination in compensation, discriminatory discharge and retaliatory discharge.
 
 II
 
 10
 Because the judgment from which he has appealed is the granting of the defendants' motion for summary judgment, Gray must show that there was a genuine issue as to a material fact. To accomplish that objective, Gray must present evidence supporting his position through "depositions, answers to interrogatories, and admissions on file together with ... affidavits, if any." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).
 
 
 11
 * Gray argues that he was denied equal compensation because of his race. "To establish a prima facie case of racial discrimination with respect to compensation, a plaintiff must show that he was paid less than a member of a different race was paid for work requiring substantially the same responsibility." Pittman v. Hattiesburg Mun. Separate School Dist., 644 F.2d 1071, 1075 (5th Cir.1981) (citations omitted). To meet this standard Gray has relied upon the fact that Worth Mizell, a white employee who was technically subordinate to Gray, was paid $10,000 more per year than Gray was. Mizell, according to Gray's argument, performed substantially the same functions as did Gray. On that basis, the argument runs, a comparison of Gray to Mizell sufficed to establish a prima facie showing of discrimination in compensation.
 
 
 12
 Not surprisingly, RCI has not agreed. First, RCI has argued that the proper comparison to similarly situated white employees is to those white employees who held the same position as Gray, namely, other Program Managers, not to Mizell. RCI has come forward with evidence showing that the other Program Managers performed substantially the same functions as Gray. Each of the other three Program Managers in the Aviation Directorate, all of whom were white males, were paid less than Gray. The district court concluded, "I think that is the group with which [Gray] must be compared." Gray has offered no evidence disputing (1) that he was paid more than the three other, white male, Program Managers or (2) that he performed substantially the same functions as did they. Therefore, the conclusion that Gray's discriminatory compensation claim may have merit fails because he was paid more than the white males to whom he should be compared.*
 
 
 13
 Even if it were appropriate to compare Gray to Mizell, in addition to being paid more than Gray, Mizell was paid more than the other three white male Program Managers. That reduces the force of the argument charging discrimination, for it cannot be established that the salary difference between Mizell and Gray was due to racial differences. RCI also came forward with evidence that because of the technical nature of much of RCI's work, it was not unusual for RCI subordinates to be paid more than their superiors. Indeed, Mitchell made more than Skinner, even though he was Skinner's subordinate.
 
 
 14
 Gray's response to RCI' arguments has been various unsubstantiated claims. He contends that "the record evidence shows that no other similarly-situated white employee had employees under their [sic] supervision who earned more than their supervisor." Gray has cited only a memorandum of law he submitted to the district court in which he made the same claim. Gray has attempted to promote to relevant evidence his statement: "Defendant Skinner contradicted his own sworn testimony by admitting in his deposition that no other superior in his Operations Center had subordinates who were paid more than their supervisors." However, for support he has cited a page of Skinner's testimony which simply does not support the claim and indeed includes the contrary claim.
 
 
 15
 Gray, it would appear, has nothing to rely upon other than the fact that he was paid less than Mizell. He has not presented evidence contradicting the fact that he made more than other Program Managers who were white males. Although there was some overlap between Gray's duties and those of Mizell, he has not provided any reason why he should not be compared to other Program Managers and he has not explained how Mizell's salary could reflect racial discrimination if that salary was also higher than the salaries of the other white male Program Managers. Finally, Gray has provided no evidence that he was the only Program Manager who was paid less than subordinates. Although we must be mindful of the fact that the case was disposed of on summary judgment and, therefore, factual disputes should be resolved in Gray's favor, in view of the absence of substantiating evidence, we have an obligation to affirm the district court on Gray's discriminatory compensation claim.
 
 B
 
 16
 Next we meet an argument that RCI fired Gray because he was black. Gray has pointed to the familiar factors of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), arguing that he is a member of a protected class, he was qualified for his job and RCI attempted to refill his job after it fired him. RCI argues that the record evidence shows that it did not attempt to refill Gray's job, and that Gray, therefore, has not made out a prima facie case. However, RCI argues, even if Gray has made out such a case, RCI has shown that the reason RCI fired Gray was the nondiscriminatory one of lack of work. Gray, RCI claims, has presented no evidence that the lack of work reason was a pretext. The district court held that "the defendant has articulated a legitimate, nondiscriminatory basis upon which [Gray] was discharged, namely lack of work, and I think there is no evidence that the plaintiff has come forward with to show that this was pretextural."
 
 
 17
 RCI supports its claim that Gray was fired for lack of work in three ways. First, RCI points out that the uncontradicted evidence showed that Gray's primary source of work in 1988 was the ARINC contract, which was completed five weeks prior to Gray's discharge. During those five weeks Gray performed no work chargeable to an RCI client. Second, RCI presented evidence that the Aviation Directorate as a whole suffered during this time. Over an eight month period that included Gray's release, twenty-three Operation Center 7000 employees, twenty of whom were white, were released. Included among these was one of the other three Aviation Directorate Program Managers, who also was white. Finally, RCI claims that Gray produced no new work during the summer of 1988.
 
 
 18
 Gray has disputed only the third point, claiming that he "developed sufficient new business during the summer of 1988 (prior to his discharge) to support himself and/or his subordinates for continued employment." Gray supports his contention by referring us to a memorandum of law submitted by him to the district court in which he made the same claim. Giving Gray the benefit of the doubt, we have excused his failure to cite to us relevant portions of the appendix and we have ourselves sorted through the citations to record evidence contained in the memorandum of law. Although that task has been hampered by the facts that the exhibits contained in the appendix are not identified by exhibit number and some of the evidence cited in the memorandum appears not to be in the appendix at all, our review of that evidence confirms that there is no dispute as to the absence of work being produced by Gray. Similarly, we are unpersuaded by Gray's sweeping contention, made without citation to record support, that "he offered rebuttal evidence which the district court should have given deference to and resolved favorably in [Gray's] behalf."
 
 
 19
 The lack of evidence contradicting RCI's abundant evidence of discharge for lack of work is dispositive. Therefore, we affirm the district court's grant of summary judgment for the defendants on Gray's discriminatory discharge claim.
 
 C
 
 20
 Finally, we must deal with an assertion that Gray was discharged in retaliation for filing the July 21, 1988, grievance with RCI and the August 16, 1988, grievance with the EEOC. Gray has noted that his discharge on September 26, 1988, occurred shortly after the filing of those complaints and only five days after he discussed the complaints with the General Counsel of GAI, RCI's parent corporation.
 
 
 21
 Gray has recognized, however, that to establish a prima facie case of retaliatory discharge, he must show that he engaged in protected activity, that he was subsequently fired and that there was a causal link between the activity and the discharge. See Dwyer v. Smith, 867 F.2d 184, 190-91 (4th Cir.1989). After noting that there was "a real question whether the decision makers were aware" of Gray's protected activities, the district court held that it did not matter anyway because Gray had not shown "any nexus between his activity and the discharge."
 
 
 22
 Gray's response to the absence of a nexus is insufficient. He has made the assertion that: "plaintiff has established a causal connection between his protected activity and the adverse employment action he suffered. There was less than two months between the filing of plaintiff's grievance and his discharge." To allow such post hoc propter hoc logic to establish a nexus would be to eviscerate the need for a causal link between the protected activity and the discharge. It has already been rejected in other contexts. See Johnson v. Town of Elizabethtown, 800 F.2d 404, 406-07 (4th Cir.1986) (rejecting argument that the fact that discharge occurred after speech protected by the first amendment established sufficient causal link); see also Autry v. North Carolina Dept. of Human Resources, 820 F.2d 1384, 1386 (4th Cir.1987) (plaintiff has "to show that she was not promoted because of her race, not that she was a member of the black race and was not promoted") (emphasis in original). Moreover, as noted above, Gray cannot combat RCI's abundant evidence of legitimate reasoning for his discharge. Whether viewed as Gray's failure to make out a prima facie case or RCI's success in showing a legitimate reason for the firing, Gray's claim was properly dismissed. See Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir.1989) ("Plainly, mere knowledge on the part of an employer that an employee it is about to fire has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging that employee.").
 
 
 23
 Gray has also emphasized the fact that the district court said there was a "real question" as to whether those who fired Gray were aware of Gray's protected activities. Gray has argued that the "real question" should have precluded summary judgment. However, the argument distorts the nature of the district court's holding. The district court noted the "real question" simply to show that it was unconvinced that it needed to consider the existence of a causal link at all. The district court's conclusion ultimately assumed that the decisionmakers did know about Gray's protected activity. Having, for purposes of its decision, resolved that "real question" in Gray's favor, the district court correctly held that Gray's claim nonetheless failed because he could show no causal link.
 
 
 24
 Therefore, the summary judgment for the defendants on Gray's claim of retaliatory discharge and the claims for discrimination in compensation and discharge is
 
 
 25
 AFFIRMED.
 
 
 
 *
 Further RCI has noted that Gray's own deposition testimony suggests, although it does not state explicitly, that he and Mizell performed different functions